The Electronic Arts video games, as we discussed in the last argument, are expressive works that are protected under the First Amendment. And regardless of which test this Court chooses to apply, it should find that the NCAA games are expressive works and that they are protected, and that the right of publicity claims should probably have been dismissed by the District Court. Under the position advocated by Mr. Keller's counsel, he would carve out from the First Amendment anything that portrays someone in a realistic way. If it is an actual likeness, if it is a documentary-style portrayal, Mr. Keller's counsel would argue that that fails the transformative use test, and that, therefore, is not protected under the First Amendment. There's nothing that suggests, in any decision by the California Supreme Court or any other court, that there is somehow a distinction of First Amendment protection that applies to works that are realistic portrayals of people and works that are not, when it's done in the context of an expressive work. What the Supreme Court said in Comedy 3, in fact, is that when you're looking at what is transformative use under the test that they adopted, that even decisions like their prior decisions involving the Howard Hughes documentary or involving the Rudolph Valentino movie, that those would be transformative uses. But under Mr. Keller's analysis, which was adopted by the District Court, that couldn't be because those were actual likenesses or portrayals of people in the real settings, portraying them as the real people that they are. They weren't portrayed as monsters or half-worms, nor were they put in some kind of phantasmical situation. In those situations, which the California Supreme Court said in Comedy 3 would be protected under the transformative use test, those situations are very much akin to the use of players' likenesses and names and images and so forth in video games, which are also protected. What the Court says you're supposed to look at under the transformative use test. Roberts. Let me make sure I understand the distinction that you're drawing. So you're suggesting that the California Supreme Court in Comedy 3 suggested that movies would be, by their very nature, might be transformative. Yes, what the Court said. But the t-shirt with the three stooges was not. They're difficult. Even though it was a charcoal artist who's using an unusual medium and imbuing this with some personality of his own as well, because it's not a photograph. And I agree, Your Honor. It is a difficult distinction because the test itself is a difficult test to apply. And it's clear that the Court struggled with how you apply a First Amendment test to something that is clearly a functional item that's not expressive at all, but has something expressive added to it. In the ETW case, the Court took a very similar circumstance involving the artistic portrayal of Tiger Woods, along with, in the background, portrayals of other famous golfers, and said that that clearly is protected under the First Amendment. And it's hard to reconcile those two cases. How do you reconcile ETW with our decision in Hilton? The difference from ETW and Hilton, Your Honor, was the only things that the Court considered in the Hilton case were the transformative use test and the public interest test, because those were the only items that were used. Right. Right now we're just talking about the transformative use test, so Hilton would seem to be right on point. What Hilton was, it was a real actual likeness of Paris Hilton, and using it with just a graphically displayed body. And the Court said that that was not Right. But it was a graphically displayed body. They changed her body. They changed the context from the TV show when they put it on the greeting card. That's correct, Your Honor. And our Court said, this is a close case, but we cannot decide this at this stage of the proceedings. That's correct. The Court said that it wasn't that it they didn't make a finding that it was not transformative, but they said that it's a close enough case that that had to go on to another level, go to the summary judgment or go to a jury. It could not be decided on an early motion. But, Ms. Hager, before we lose the question, at this stage means not just on a motion to dismiss or summary judgment, but it's even got a different prism, which is the slap. That's correct, Your Honor. So if the Court were to affirm for any reason, then what happens? The case goes forward. The case goes forward. And you can then move for summary judgment? Yes, Your Honor. Okay. You've blown your 12b-6, I guess. There was a 12b-6 motion that the District Court also denied. Okay. So the case would go forward and then go forward on the merits of the First Amendment defenses. Yes, Your Honor, except that the test that the District Court said is the applicable test is not consistent with what either the California Supreme Court has said or the District Court has said. If, let's say hypothetically, we were to say, I mean, the District Court got the focus wrong. The District Court focused entirely on the individual likeness instead of the individual likeness within the work as a whole in order to determine whether it was transformative. But still can't say with certainty that EA wins as a matter of law. The case would go forward, right? The case would go forward, Your Honor. You could reverse on the test or give direction to the District Court. The test that we said was correct. That's correct, Your Honor. The Court could make that decision. What I would urge the Court to do, however, is because the item that the Court would have to evaluate in order to make that judgment is before the Court, as it was in the Brown case. And because this Court and the U.S. Supreme Court and the California Supreme Court have all said that in cases involving expression, the First Amendment, that it is important for the Court to decide the case at the earliest possible opportunity, that rather than remanding it for the District Court to make another decision based on a correct description of the law, that this Court can and should decide it at this stage. And can do that by looking at the game in question. This is not a case where they've simply taken someone's likeness and there is nothing more as in the Comedy III case. This is not a case, even like ETW, where there's arguably some similarities or Hilton. This is a case very much like the cases that Comedy III said would be transformative under its own test, like the Rudolph Valentino movie in the Guglielmi case, which was decided on demur. The Court, the California Supreme Court in Guglielmi affirmed the granting of a demur simply by reviewing the work in question and finding that it was protected under the First Amendment. And there's a litany of cases that we have presented to the Court where district courts and trial courts and appellate courts have all decided cases, whether it's defamation or copyright or cases like this one involving right of publicity, have decided those cases looking at the expressive work, if it's properly before the Court, and applying the correct constitutional task. And the California Supreme Court in Winters said very clearly that often these cases should be decided on an early motion. If you have the work in front of you, the Court can make that evaluation. And this is not a close case. This is not a case where you've put someone's likeness, Jim Brown, on a T-shirt and it's nothing more. This case is far more expressive and transformative than in many of the cases that we've cited to the Court. They've added all kinds of things, not only audio commentary that was drafted or written by EA's artists, graphics that were created by EA's artists, the fans and mascots as well as players and coaches, users participating in not only creating the own visual works, because you can graphically change the way a player is presented in the game. You can make them blonde or brunette, more muscular, less muscular. You can replace their head with a mascot head. How does the fact that this game is interactive and that you have somebody that Electronic Arts can't control, so Electronic Arts can give you the parameters for Keller when he was at ASU, but you've got somebody else who's on the other end of the controller who can apparently change his number. Can he add his name to the jersey? Is that what I understand?  They can make all kinds of changes to individual players. But they could call him Bybee if they wanted to choose a really distinguished name. They could indeed, in a lousy football player. They could add muscles or detract muscles. They can change hair color or whatever they mean by that. They can make him into a running quarterback as opposed to a throwing quarterback. How do we figure that into this calculus when there's another factor that comes into this that does not reflect what the original artist put into this, other than the fact that they've given you options? The fact that the game is interactive doesn't make it less constitutionally protected or less expressive. Quite the opposite. The Seventh Circuit addressed this very point in the American Amusement case, and it's also been addressed by other courts, including this court's decision in Anderson, where there's a customer or user in this case involved in the process of expression. That makes it more expressive and more creative, not less. And this court in Anderson said, involving tattoos, the fact that an individual customer may also contribute to the design of a tattoo doesn't decrease its constitutional expression or its protection. What the interactivity means is that it is expression, and that's one of the elements that actually adds to the creative nature of this game, not detracts from it. The users have other features that allow it to map the entire college history of a particular player. You can follow a player throughout their career and pick their classes and pick other events they're involved in and see how that affects their abilities on the playing field. That's very creative and interactive. It's much more in the nature of something like a serial novel, where individuals can add to the particular expression. No one suggests that that kind of work is not protected merely because people can interact with the novel and add parts to it. Their work is expressive and protected, just like the original drafter of the  The fact that you can create completely hypothetical situations also doesn't make it less expressive. You can have teams playing each other that would never play each other in their real life. You can take the 1979 Trojans and have them playing a current team to see how they stack up with different teams. Or, as I said, you can have teams that entirely have mascot heads on them and have them play each other. That is creative and expressive work. That simply takes it out of the realm of something that is merely a likeness for its own sake and nothing more. And if you apply, as we've urged the court to do and the Eniki urged the court to do, apply a test like Rogers to this scenario, it clearly meets the two-part test in Rogers to be protected speech. Because there's no kind of implied advertisement there. There's no suggestion that by simply putting someone's picture on a T-shirt, that they are promoting that T-shirt. These are people who are in a game that has all these creative elements to it. And no one, again, disputes. No one in the parties, no one in the district court even disputes that if you were to do the same thing in a book or a motion picture, that it would be absolutely protected under the Constitution. And there's no rational way for this court to draw a distinction between those kinds of works and this particular video game, which incorporates all these creative elements. If the court were to find that you may never use an actual likeness or run afoul of the right of publicity, as Mr. Keller's lawyer suggests, then you're not going to have two of the Academy Award-nominated movies which simply disappear. You can't have The King's Speech or The Social Network. You can't have films like Men in Black or James Ellroy novels because they inherently use names and likenesses of real people. You could not ever use the name of a real person because the name is inherently you can't transform it. The name is what it is. So that analysis simply writes that out of the statute entirely because you can't transform an actual name. So you could never use a person's name in any kind of expressive work. And that simply can't be the law. The California Supreme Court has certainly not said that. To the contrary, as I mentioned before, they have taken other cases that they decided previously involving works about real people where those real people were being portrayed and said those would be protected under the transform and effuse test. So it's apples and oranges to try to compare electronic arts video game, in this case, with somebody's picture on a T-shirt or a coffee mug or something that is a non-expressive item to which something that's a mere likeness has been added or named. It simply can't be applied under the same test. The other test that I asked the Court to take a second look at is the public interest test. And it's ironic that Mr. Keller's counsel on the one hand says, oh, well, these games are not transformative because they're realistic. They actually just portray real people and statistics and everything about the player is exactly as it should be. Yet when you get to the public interest test and the games like CBC involving fantasy football leagues, real names, likenesses, statistics, and so forth, Mr. Keller's lawyer says, oh, those don't apply because this game is different. It's manipulative. It's creative. It strikes me that you can't have it both ways. The amount of information in these games, according to Mr. Keller, includes all the same things that the Eighth Circuit in the CBC case, the District of Minnesota in the CBS Interactive case, and the California Court of Appeal in the Gianfrida case. All of that kind of information about real people and players, their biographical information, is protected under the First Amendment. And as the court pointed out in CBC, it makes no sense that anybody has access to this publicly available information and could print it in a book or newspaper or a magazine. But if you use it in a fantasy football league, that that somehow interferes with the right of publicity of these players. That simply cannot be the law under the First Amendment. And none of these cases can be distinguishable from the use in our particular video game, our expressive work. The Montana case, although taken from a news report, doesn't say that it's decided based on the fact that it's in a news report. To the contrary, the court says the same protections would apply to motion pictures. Those aren't news events. Those are motion pictures, often in dramatic fashion. And the court in Montana said the same thing applies. So if you look at that test and Mr. Keller's argument, then the court, forciarly, has to come to the conclusion that these works are similarly protected because they do have information that is protected under the First Amendment. And the only thing he's complaining about is that kind of information being used in the games. He's not complaining about the mascot heads or the users being able to manipulate people to make them look different. He's complaining because it uses real information, biographical information, statistics. He says that's what is objectionable here. That's exactly the same information that's covered by these tests. With the Court's permission, unless you have questions, I'd like to reserve the remainder of my time. Kagan. Mr. Berman. Thank you, Your Honors. Steve Berman on behalf of plaintiff Sam Keller. I think I'd like to start with reminding the Court something that EA's counsel has skirted away from, and that's the Cicchini case. And where the Supreme Court of the United States held the right of publicity trumped the First Amendment rights at stake. And in doing so, it pointed out that the purpose of the right of publicity is to perhaps protect the theft of an economic right, grounded in the rationale of protecting against unjust enrichment, taking someone's performance in goodwill. At this stage in this case, it is undisputed that EA Sports has taken the likenesses of these college players without compensation. And it has done so, even though it pays for the right to do so in the professional sports context. I know it doesn't matter. It's just a matter of curiosity. What economic right does a college football player have? Well, they have none. But once someone has stolen your likeness, you're not supposed to be commercialized. Well, I know, but you're putting an awful lot of weight on the Supreme Court's articulation of the purpose. I'm putting weight on it because what we're here for is you can't take someone's rights for nothing. Well. And that's what occurred in this case. If you have them. Well, even though the NCAA says you're not supposed to commercialize these athletes, they didn't surrender their right to protect their identities. And that's what's at issue here. So we have that kind of policy at stake. They pay for it for professionals and not for college athletes. That gets me to the more important procedural part of this case that makes this, I think, a little different than the Brown case. And that is EA has not challenged the sufficiency of the claim. EA has admitted at ER6, the trial court found, that we've stated a claim for the right to publicity. And that's important because we're on a slap statute, and the purpose of a slap statute is to deter frivolous lawsuits. So one cannot say this is a frivolous lawsuit when EA has admitted that we've stated a claim. So we're here procedurally, just like the plaintiff was in the Hilton case, where the court has to say as a matter of law that EA has met its burden on its affirmative defenses. And we submit for a number of reasons it has not done so. First, let me talk about waiver. We don't have to win the waiver argument. We just have to show at this stage that there's a chance we can win. And the waiver argument is simply that EA contracted, and it's uncontested in our pleading, that they would not use the athlete's name or likenesses in branded video games. That's what we alleged. EA came forward with no evidence to the contrary. And on a slap motion, the judge is entitled to take a look at the pleadings and evidence. There was no evidence contradicting this prohibition against using the player's likenesses. And this Court has held, in the cases we cited in our briefs, that a party can contract away a right and then cannot later reassert, well, because I contracted away, I still can assert my constitutional rights. You can contract away those constitutional rights. This Court need not get to the thorny First Amendment issues because there's a very good chance that we will win. There will be no First Amendment issue in this case, that EA has waived it. But let me go on to the First Amendment issue, and that's the transformative use test. The test, which I didn't hear counsel articulate, is whether EA can establish as a matter of law at this stage of the case that this became more than the player's likeness, but somehow was transformed into EA's creative element. And I submit to the Court on this record, you cannot find as a matter of law that there's been transformation. I think one of the interesting things here is that the purpose of this game is realism. EA says if it's in the game, it's in our game. They strive for realism. Striving for realism is really the exact opposite of the Winters case. And if you look at this as bookends, you have the Comedy III realism, which the Court said was not protected, and you have the Winters transformation at the end of these bookends, and the courts have tried to use the transformative use test to figure out where the product or game at issue fits between these bookends. In this case, on this record, it's much closer to Comedy III than to Winters, and I think the district court was correct. What do we do? I asked Ms. Sager the same question. I wanted to put it to you. What do we do with the fact that EA can't control the interactive factor here? EA has programmed into this that somebody can come in and they can change Keller's name, they can put his name on a jersey. It's not currently on a jersey. They can change his number. They can make him a running quarterback or a throwing quarterback. Can they make him a tight end? I don't believe so, but let me answer your question in two parts, Judge Bidey. First of all, let's look at the Comedy III t-shirt, right? Someone could have taken a pencil or pen or a paintbrush and totally changed the way that t-shirt looked. That didn't change the fact that when the t-shirt was created by the Comedy III artists and presented to the wearer of the t-shirt, it was not transformative. It was not creative. It was just a theft of the likeness. Similarly here, what's being given to the game player is simply the exact depiction of Sam Keller. If I could just take a moment to hammer this point home. Sam Keller in the game, Sam Keller in real life, from the same university, the same height, same weight, same skin tone, same hair color, same right-handed quarterback, same home state, same facial features, same type of gear that he wears, same type of player. He's a pocket passer. They've taken him identical, and all the other players, their identical replications, and they've given them to the player. There's nothing that EA Sports has done that is expressive. EA Sports has not transformed these players, as a matter of law, beyond the mere depiction of their likenesses. If that were the test, then wouldn't, as a matter of law, there never be a transformative use whenever someone's likeness or name is used? Well, I would answer, Your Honor. Because to me, you're focusing entirely on the one thing that you went on. That is, I mean, nobody's saying it wasn't likeness. Well, let me answer that. The question, though, under the California test is whether the work as a whole is transformative, whether the use of the likeness is raw material or whether it serves some other purpose. I would answer that, I think, twofold. Number one, I refer the Court to two cases that I think illustrate how this answer should come out. The one is the Hilton versus Hallmark Powers case, which I'm not going to repeat because you're familiar with it and you know that it's squarely, I think, on our side. And the other is the Kirby versus Sega America case. And that's the one that Judge Wilkin addressed. And there, I think, the Court looked at not the whole work, but looked at how Ulala, if I'm saying that correctly. I mean, it's not entirely true that it didn't look at the whole work. I mean, it said she was coming back as a reporter in 2000, whatever the year, way in the future from a different planet. Well, let's look at what they said. They said it was not a literal depiction because Ulala was taller. The theme was different than what she was doing in real life. She had different hair and costumes, different dance moves, and therefore, there was a transformative element. Here, Keller and all the other players are exactly as they are in real life. The game is exactly as in real life, just like in the Hilton case where Hilton was on the card depicted just as she appeared in the show. Keller is in the game here just as he is in the game in real life. So I submit to the Court that at this stage, given this factual record, that EA has not met its burden as a matter of law, and as in Hilton, we suggest that the Court send it back down so there can be a fuller record when this First Amendment issue comes before the Court. Now, the Rogers test that's being urged. Before you get to the Rogers test, I'd like you to go to the public interest test just to get the contrast as to why, if realism is the touchstone of what EA has done, then this doesn't qualify under the public interest test. Okay, I'll turn to the public interest test. The Court in the Hilton case, and I'm quoting, said that the California cases that established the public interest defense linked the defense to, quote, reporting of recent events. So we have newsworthy items or recent events. Although the games are realistic, in other words, Sam Keller has all the characteristics that I've outlined for you, there's nothing factual that's transmitted here about Sam Keller. There are not real player statistics that are being used, like in the baseball case, the Ian Fito case, that the game doesn't publish any newsworthy item about Sam Keller or any of the other athletes in the game. They just take his image and make an avatar out of it. That is not what happened in the Ian Fito or the Montana case, where Ian Fito involved making historical facts available to the public through programs and websites. The public had an interest in those baseball facts. Here, there are no facts. Those newsworthy facts being made up of baseball facts. But didn't you just read us a series of comparisons between Keller and his avatar? But those are not what I would call the type of facts that are protected by the public interest exception. They are embedded in Keller. Okay. What kinds of facts are protected by the public interest? Well, if somehow, to make the analogy to the Ian Fito case, if this game somehow came with actual statistics, that Sam Keller on this date. Why can't they simply represent those statistics in an interactive game? Well, we don't know that they have. I mean, what they're doing is they're just using his replica. They're not taking facts. Then it becomes very similar to sort of fantasy football or fantasy baseball. Well, in fantasy football, there are two things that happen in an A-Circuit case. Number one, the court again said, they're just taking facts, public facts that anyone could pick up in a newspaper about how a player performed. And they're saying, you know, these are the facts you can use in our league. They didn't steal the likeness of the player and put them in a game. They used historical facts. And the court there also found something that's not present there. It found we're not so concerned about if there is a theft of publicity rights because those baseball players have huge earning power. And so even if there's an infringement, we're going to balance in favor of the First Amendment because they're going out and they're getting paid for their That's obviously not occurring here. So that part of that A-Circuit test is not applicable. These college athletes are not being able to make money off the sale of their likenesses elsewhere. So for those reasons, we think the public interest exception, which the Ninth Circuit really held relates to publication of newsworthy items, is not applicable. There's just no news reporting going on here. There's nothing statistically or factually being reported about these players' performances that's then being used by the public. Now, with respect to the Rogers test, we think there's no reason for the court to use the Rogers test. It's a test that is applied to product titles. If you read the Rogers opinion, and I was kind of struck last night when I was reading it, it goes on and on for pages with a Lanham Act analysis as to why it should apply that test. And then when it gets to the right of publicity, there's no analysis of how it derives its test applicable to the right of publicity. You have before you the Comedy 3 test. It's a test that's been applied by the Hilton Court and by other courts. It's a test which the Kirby Court found was easy to apply. There's no reason to depart from that test. If the court was going to adopt a new test for this case, we would submit that the predominant use test adopted by the Missouri and Colorado Supreme Courts is the appropriate test. That is much easier to apply than the Rogers disguised advertising inquiry. What it basically says is if the predominant use is to exploit for a commercial purpose, it's not protected. If the predominant use is expressive, it's protected. Let me give you an example of how that test would work. Let's take a Wheaties box, and we put Sam Keller on a Wheaties box in order to sell more Wheaties. That's clearly a commercial use. That's exploiting a likeness. But let's say that we had a film where we used the name Gandhi because we wanted to tell the story about Gandhi. That is primarily for expressive purposes, to tell a story. That would be protected by the First Amendment. The notion that this case, if Keller wins, would put an end to the movie industry, I say is nonsense. Amici and EA started out their brief by saying that if Keller wins, no more Forrest Gump. Well, that's not right. Movies are expressive. They're filled with expression. The test that the court below applied would not prohibit the playing of any movie. Forrest Gump was clearly transformative. And what's lacking here on this record is any real notion as a matter of law, because we're here on an affirmative defense, that EA should win and say that no juror can find that this was not transformative, that we suggest that the case be remanded for further development on this issue before the district court. And I say I have more time, but unless you have more questions, I'm done. I don't think so. Thank you. Thank you very much. Senator? I'd like to start where Mr. Keller's counsel ended, where he says that what this court should do is compare the use on a Wheaties box to the use in what he calls an expressive work. We disagree with the use of the predominant use test. No court in the country but the Missouri Supreme Court has adopted it because it's not protective of the First Amendment. But if that is what Mr. Keller's counsel tells you is the issue that this court should decide, it's clear that the district court erred and this court should reverse on all grounds. This is an expressive work. Mr. Keller did not dispute that in the district court, did not dispute that in his opening brief to this court. He even conceded on appeal that the first prong of the SLAP statute is met, which requires conduct in furtherance of free speech about a public issue. The record before this court demonstrates that this is an expressive work, and I won't repeat what I described before about all the different creative elements that go into this game, but I would point simply to two other things. One is the decisions from this court in ESS and the decisions from a wide number of other courts across the country that say that video games like this are expressive works entitled to First Amendment protection. And I would point to this court's decision in Anderson, which said that a tattoo and tattooing businesses are expressive, protected by the First Amendment. And the court went to great lengths to explain the broad nature of the expressiveness that's protected under the First Amendment. If those things are expressive and are protected, there is no question that this court should decide that the video game at issue here is expressive. And under Mr. Keller's counsel's position, this is not a Wheaties box. This is not a T-shirt with Sam Keller's picture on it. This is an expressive work which he says under the test that he asks this court to adopt is protected. A couple other points he makes that I'd like to respond to. The first is this notion that the right of publicity is this important right that should trump everything else,  The right of publicity this court and every other court has held must be consistent with First Amendment rights when you're dealing with an expressive work, not a Wheaties box, an expressive work. The zucchini case was a sui generis case by everybody's estimation in which the plaintiff's entire act was taken and broadcast so that nobody had to pay to go see him perform anymore. That's not the case here. Nobody suggests that people have stopped watching college football or electronic arts video games. To the contrary, I believe the statistic last week was 111 million people watching the Super Bowl. Certainly millions of people follow college sports. So it doesn't replace the original live game. But as the court pointed out, Mr. Keller doesn't have the right to stop someone from showing him playing in college football anyway. Those rights to those broadcasts don't belong to Mr. Keller and never have. So the idea that he somehow is in the same position as Mr. Zucchini trying to protect his work as an athlete has no application whatsoever. I want to address briefly the waiver issue because they've spent a great deal of time on it before this court. The burden on the SLAF statute, once the initial prong is met, which Mr. Keller has conceded, the burden shifts to Mr. Keller to demonstrate on the merits his case and produce evidence if necessary to do so. We don't dispute that electronic arts had the burden of proving the necessary facts to establish its affirmative defense, which it did by presenting the game to the district court and to this court. You can look at the game and determine as a matter of law whether the First Amendment applies, whether this is an expressive work. But what Mr. Keller says is then if he has another argument he wants to make about why that affirmative defense doesn't apply, that somehow we still have the burden, and that's not true. This court in the Payen case, which I believe they actually cited, is to the contrary. In that case, this court was dealing with a statute of limitations defense, and the question about whether or when the plaintiff received notice. The argument was that the plaintiff had received notice at some point, but it wasn't clear when the plaintiff had received notice. This court held that the defendant did not have the burden of proving exactly when the plaintiff received notice. All the defendant had to prove is that notice was received at some point and when it was mailed from the EEOC, and that there was a presumption that it had arrived within a certain period of time. The burden was then on the plaintiff, the plaintiff, not the person who had the affirmative defense, on the plaintiff to show that in fact she did not receive that within a certain period of time. So the burden on an affirmative defense doesn't simply stay with us because he wants to make an assertion unsupported by evidence, and it was unsupported by evidence. There was nothing presented to the district court. There's nothing that this Court has accepted in terms of new evidence to establish that point. The two cases that Keller, Mr. Keller, cited in the district court, the Navalier case and the Damon-Chrysler case, also support this point. I think I've dealt with the other arguments on the transformative use test, but I think that the questions from the Court demonstrate that precisely the kind of work, the kind of use of realistic people in real works, that those would not be permitted under Mr. Keller's test. But under the predominant use test that he asked this Court to adopt, the district court has to be reversed. Thank you, Your Honor. Thank you, Mr. Ager. Thank you, Mr. Berman. The matter just argued will be submitted in the court standing recess for the day. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Quist, Rymer, Bybee